*__Not for Publication__*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **STEVEN EARL GOODSELL**, | Case No. **19-61117-BPH** |
| Debtor. | |
| **PARK WESTERN LEASING, INC.,** | |
| Plaintiff. | |
| -vs- | Adv. No. **20-09004-BPH** |
| **STEVEN EARL GOODSELL,** | |
| Defendant. | |

## MEMORANDUM OF DECISION

Plaintiff Park Western Leasing, Inc. ("Park Western") filed  its complaint commencing this adversary proceeding on February 7, 2020.[1] Park Western's Complaint seeks to except from his discharge damages stemming from Debtor/Defendant Steven Earl Goodsell's ("Goodsell") alleged conversion of Park Western's property. Park Western contends its debt is nondischargeable under § 523(a)(6) because its damages are attributable to a willful and malicious injury, specifically conversion committed by Goodsell.[2]

---

[1] ECF No. 1. References to "ECF Nos." refer to the docket in this adversary case.  Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.
[2] *Id.*

1

The Court conducted a trial on January 28, 2021. Appearances were noted on the record. Dawn Davis, Eric Karst, Goodsell, and Carleen Palen testified. Park Western's exhibits 1–4 and 6 and Goodsell's exhibits C and F were admitted without objection. Goodsell's exhibits B and G were admitted over Park Western's objection. Based on the record developed before this Court, the following constitute findings of fact and conclusions of law to the extent required by Rules 7052 and 9014.

## BACKGROUND

### I.      Leases between the parties.

The dispute in this adversary proceeding stems from agreements between Park Western and Right Way Trucking, LLC ("Right Way"), an entity owned solely by Goodsell. In late 2015, Park Western informed Goodsell that one of its clients was going out of business and had three semi-trailers for sale that Goodsell may be interested in acquiring or leasing. While examining the trailers, Goodsell discovered the same client was also selling a 2007 Kenworth semi-tractor ("Kenworth"). After some additional discussions between Goodsell and Park Western, Park Western agreed to purchase the Kenworth for $35,000 and lease it to Right Way, along with the three semi-trailers. The parties executed a lease agreement in early 2016. In conjunction with the 2016 lease agreement, Goodsell executed a personal guaranty.

Approximately 2 years later, in May of 2018, Park Western and Right Way entered into an additional lease agreement related to the Kenworth and three semi-trailers, (the "2018 Lease").[3] As he did in 2016, Goodsell executed an individual guaranty in conjunction with the 2018 Lease. The purpose of the 2018 Lease transaction was, at least in part, so Goodsell could purchase an additional truck from his father.  Three provisions in the 2018 Lease are of particular

---

[3] Park Western Exhibit No. 1.

relevance here. First, Paragraph 7 of the 2018 Lease states that its provisions "shall be interpreted in accordance with the laws and regulations of the State of Colorado."[4] Second, Paragraph 3 of the 2018 Lease provides that Park Western, as Lessor, disclaimed any and all express or implied warranties related to the "Equipment," defined in the 2018 Lease to include the Kenworth, the three semi-trailers, as well as "any replacement parts, additions, repairs, or accessories no or hereafter incorporated in or affixed to it." Paragraph 3 also provides that Goodsell, as Lessee, had inspected the Equipment, was satisfied with his inspection, and agreed to lease the Equipment "as is" and "with all faults."[5] Finally, Paragraph 11 of the 2018 Lease provided the following:

> 11. **Installation, Maintenance and Use**. Lessor shall have no obligation to install, erect, test, adjust or service Equipment. Further, Lessee, at its sole expense, shall keep Equipment in good working condition and repair and furnish all labor, parts, mechanisms and devices required thereof. Lessee shall use the Equipment in a careful manner, make all necessary repairs at Lessee's expense, shall comply with all laws relating to its possession, use, or maintenance, and shall not make any alterations, additions, or improvements to the Equipment without Lessor's prior written consent. *All additions, repairs or improvements made to the Equipment shall belong to Lessor, and shall be made at Lessee's sole expense.*[6]

At some point, the Cummins ISX engine originally placed in the Kenworth began to experience problems. The parties presented conflicting testimony regarding when the engine failure occurred, however, it is undisputed that Goodsell replaced the Cummins ISX with a CAT C-15 engine at some point prior to July 2019.

The details surrounding Goodsell's acquisition of the CAT C-15 engine were scant. Goodsell testified that he obtained the CAT C-15 engine from an unidentified third-party known only as "Marvin."[7] According to Goodsell, Marvin agreed to give Goodsell the CAT C-15 for no

---

[4] *Id.* at 2.
[5] *Id.* at 1.
[6] *Id.* at 3 (emphasis added).
[7] Trial Transcript, 101:23–24.

initial cost. In exchange, Goodsell planned to place the CAT C-15 in the Kenworth and attempt

to sell the truck. If successful, Goodsell would pay Marvin $50,000 for the CAT C-15 from the

sale proceeds. If he failed to accomplish the sale, Marvin would be entitled to repossess the CAT

C-15.

In September of 2019, Eric Karst ("Karst"), Park Western's Asset Manager, travelled to

Montana after Goodsell stopped making payments required under the 2018 Lease. Karst traveled

to Montana after speaking with Park Western's attorney who indicated that Goodsell was

prepared to turn over the Kenworth.[8] When he arrived at Goodsell's shop, Karst entered the

building, but was immediately asked to leave by Goodsell. Before he was asked to leave, Karst

testified that he saw the Kenworth in the shop and what he believed was the CAT C-15 engine

sitting on a pallet next to it. Karst left Montana without the Kenworth and did not return until

shortly after Goodsell commenced his bankruptcy.

## II. Goodsell's bankruptcy.

Goodsell filed his Chapter 7 bankruptcy petition on November 1, 2019.[9] On January 13,

2020, Park Western and Goodsell filed a joint "Stipulation to Modify Stay" ("Stipulation"),[10]

which was approved by this Court's Order[11] the same day. The Stipulation represented that the

leases between the parties, including the 2018 Lease, were actually security agreements in favor

of Park Western and through which Park Western obtained a valid security interest in the

Equipment described in the 2018 Lease, attached as one of the exhibits to the Stipulation.[12]

Pursuant to the Stipulation, the Court granted Park Western relief from the automatic stay and

---

[8] Trial Transcript, 69:5–6.
[9] ECF No. 1 in Case No. 19-61117.
[10] ECF No. 25 in Case No. 19-61117.
[11] ECF No. 26 in Case No. 19-61117.
[12] ECF No. 25-1 in Case No. 19-61117.

permitted it to repossess and foreclose upon the three semi-trailers and Kenworth. For purposes of this adversary proceeding, the Court adopts the parties' characterization of the 2018 Lease in Debtor's main bankruptcy case as a security agreement and will analyze it as such here.

On January 15, 2020, Karst arranged to have the Kenworth transported to a storage yard in Arlee, Montana. From there, Karst arranged to have the Kenworth towed to Commerce City, Colorado after he was informed it was undrivable due to missing its engine and transmission. After arriving in Colorado, the Kenworth was inspected by a mechanic, who informed Karst that in addition to the missing engine and transmission, the Kenworth was missing a number of other components, including its driver's seat. Karst testified that Park Western spent $50,815.99 to get the Kenworth into good working condition before selling it to a third-party for approximately $67,000.

### III.    The adversary proceeding.

Park Western commenced this adversary proceeding on February 7, 2020.[13] Generally, it alleged that Goodsell's removal of the Kenworth's driver's seat, transmission, and the CAT C-15 engine amounted to willful and malicious conversion of Park Western's property.[14] Based on these allegations, Park Western sought damages in the amount of $43,815.99,[15] which it asserts is nondischargeable under § 523(a)(6). Goodsell filed his Answer on March 5, 2020, denying the substance of the Complaint.

A trial was held on January 28, 2021. At the conclusion of the trial, the Court permitted the parties to submit post-trial briefing. Generally, Park Western's brief contends that the

---

[13] ECF No. 1 in Adversary Case No. 20-09004.
[14] *Id.*
[15] Park Western's Complaint alleged that it incurred damages of approximately $45,000 (ECF No. 1). However, its post-trial brief clarifies that the exact amount of its alleged damages is $43,815.99 (ECF No. 41).

evidence and testimony presented at trial establishes that Goodsell knew his actions of removing the engine, transmission, and driver's seat from the Kenworth were wrongful, that he committed the actions intentionally, without just cause or excuse, and were actions that would necessarily cause injury to Park Western. Accordingly, Park Western contends that the debt arising from Goodsell's acts is nondischargeable pursuant to § 523(a)(6).

Goodsell's brief generally asserts that Park Western, as the Plaintiff, did not establish by a preponderance of the evidence that Goodsell acted willfully and maliciously in removing the CAT C-15 engine from the Kenworth. Further, Goodsell contends that he had a valid excuse for removing the engine from the Kenworth and that, in his opinion, permitting Park Western to receive the benefit of the CAT C-15 engine without paying Marvin would amount to "stealing." Finally, Goodsell argues that since he paid all repair costs associated with the Kenworth prior to Park Western's repossession and would be the party responsible for paying Marvin for the CAT C-15 engine, Park Western's damages, if any, should be limited to the amount it incurred in replacing the Kenworth's driver's seat – $430.00. Notably, Goodsell's post-trial brief does not assert that Park Western lacked a valid property interest in the CAT C-15 engine.

## ANALYSIS

A creditor objecting to the dischargeability of its claim bears the burden of proving, by a preponderance of the evidence, that the debt to be excepted from discharge falls within one of the exceptions to discharge enumerated in § 523(a). *Grogan v. Garner*, 498 U.S. 279, 287 (1991). One of these enumerated exceptions, § 523(a)(6), excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The word "willful" as used in § 523(a)(6) modifies the word "injury." The Supreme Court made clear in *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), that for § 523(a)(6) to apply, the debtor

6

must intend the consequences of their act, not simply the act itself. *Id.* at 60. A creditor seeking

to establish nondischargeability under § 523(a)(6) must establish both willfulness and

maliciousness. *Ormsby v. First Am. Title Co. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir.

2010).[16]

### I.   Colorado law governs the conversion analysis.

As stated, Paragraph 3 of the 2018 Lease provides that its provisions are to be interpreted

in accordance with Colorado law. Neither party contests the applicability of Colorado law to

Park Western's conversion claim.  Thus, the Court must determine whether Goodsell committed

the tort of conversion under Colorado law before determining whether any damages associated

with his conversion are nondischargeable under § 523(a)(6). *See In re Bailey*, 197 F.3d 997,

1000 (9th Cir. 1999) ("While bankruptcy law governs whether a claim is nondischargeable under

§ 523(a)(6), this court looks to state law to determine whether an act falls within the tort of

conversion."); *Lockerby v. Sierra*, 525 F.3d 1038, 1041 (9th Cir. 2008) ("[C]onduct is not

tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but

rather is only tortious if it constitutes a tort under state law.").

Under Colorado law, "conversion is 'any distinct, unauthorized act of dominion or

ownership exercised by one person over personal property belonging to another.'" *Itin v. Ungar*,

17 P.3d 129, 135 n.10 (Colo. 2000) (citing *Byron v. York Inv. Co.*, 296 P.2d 742, 745 (Colo.

1956). "A mere breach of contract" cannot support an action for conversion. *In re Tinkler*, 311

B.R. 869, 876 (Bankr. D. Colo. 2004) (applying Colorado law). "An action for damages for

conversion of personal property cannot be maintained unless [the] plaintiff had a general or

---

[16] For a more in-depth discussion of § 523(a)(6), *see* Jonathon S. Byington, *Debtor Malice*, 79 OHIO ST. L.J., 1023, 1046 (2018).

special property right in the personalty converted, coupled with possession or the immediate right thereto." *Id.*

## II.     Goodsell converted Park Western's property.

To prevail in this proceeding under a theory of conversion, Park Western must first establish that it had an interest or right in the driver's seat, transmission,  and CAT C-15 engine added to the Kenworth by Goodsell after the 2018 Lease was executed, and immediate right to possession.  If Park Western possessed a right in the removed items, the Court must then consider whether Goodsell committed conversion. Finally, if Goodsell did convert Park Western's property, the Court must determine whether his conversion was "willful and malicious" under § 523(a)(6).

Pursuant to their Stipulation in debtor's main bankruptcy case, the parties agreed that Park Western had a cognizable interest in the Kenworth and was entitled to possession. Its interest encompassed the driver's seat and transmission, both of which were in the Kenworth at the time the 2018 Lease was executed. Additionally, Goodsell does not dispute that Park Western had an interest in the CAT-C15 engine at the time it was installed in the Kenworth. Instead, Goodsell's defense focuses on whether the removal of the CAT C-15 engine was "willful and malicious" under § 523(a)(6). Since the parties agree as to Park Western's property interest in the removed items, this Court concludes that Park Western had a cognizable property interest in the Kenworth's driver's seat, transmission, and the CAT C-15 engine.

Having determined that Park Western had a cognizable interest in the CAT C-15 engine, driver's seat, and transmission, the Court must determine whether Goodsell's removal of those items constituted conversion under Colorado law. Under the terms of 2018 Lease, Park Western had the right to take immediate possession of the Kenworth, including the CAT C-15 engine,

driver's seat, and transmission, upon Goodsell's default. To be sure, Paragraph 22 of the 2018 Lease provides that, in the event of Goodsell's default, Park Western could enter Goodsell's premises and remove the "Equipment."[17] Goodsell's act of removing the CAT C-15 engine, transmission, and driver's seat prior to Park Western's repossession of the Kenworth therefore constituted an unauthorized act of dominion over Park Western's property under the terms of the 2018 Lease. *See Itin*, 17 P.3d at 135 n. 10. Accordingly, this Court determines that Park Western satisfied its burden of establishing a claim for conversion under Colorado law.

## III.   Conversion as a "willful and malicious" under § 523(a)(6).

Turning to § 523(a)(6), Park Western must establish that Goodsell's conversion under Colorado law resulted in a willful and malicious injury to Park Western or its property.  As the Supreme Court of the United States has recognized, "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934); *see also Transamerica Comm. Fin. Corp. v. Littleton*, 942 F.2d 551, 554 (9th Cir. 1994) ("The conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6).")

The Bankruptcy Appellate Panel for the Ninth Circuit has further clarified the distinction in *Davis*:

> Essentially, for a conversion to be dischargeable it must be done innocently in the honest but mistaken belief that authority to use the collateral exists, which the [Supreme] Court labeled a "technical" conversion.

---

[17] ECF No.  at 4.

9

*Thiara v. Spycher Bros (In re Thiara)*, 285 B.R. 420, 430 (9th Cir. BAP 2002) (citing *Davis*, 293 U.S. at 332). In addition to establishing that Goodsell converted its property, Park Western must establish that Goodsell acted with "wrongful intent" and that "the conversion was intentional, as defined in *Geiger* and its progeny" for this Court to find the damages associated with Goodsell's conversion to be nondischargeable under § 523(a)(6). *In re Thiara*, 285 B.R. 420, 430 (9th Cir. BAP 2002). Stated more simply, Park Western must establish that Goodsell's conversion of its property was both willful and malicious, not merely an act of "technical" conversion.

### A.   "Willful" injury.

In the Ninth Circuit, the "willful injury" requirement is satisfied only if "the debtor has a subjective motive to inflict injury or when the debtor believes the injury is substantially certain to result from his own conduct." *Ormsby*, 591 F.3d at 1209. Although the "willful" standard is a subjective one, "the Debtor is charged with the knowledge of the natural consequences of his actions." *Id.* at 1206.

Goodsell contends that his removal of the CAT C-15 engine, transmission, and driver's seat was not "willful" under § 523(a)(6). In support of this contention, Goodsell's post-trial brief relies heavily on *Budget Fin. v. Moore (In re Moore)*, 2009 WL 3837791 (Bankr. D. Mont. 2009). In *Moore*, this Court analyzed the "willful and malicious" standard under § 523(a)(6) where a debtor who entered into a combined note and security agreement with a creditor for the sale of a van removed three bench seats, the original tires, wheels, lug nuts, hub caps, and the battery from the vehicle before the creditor obtained stay relief and repossessed the vehicle. *Id.* at *2. At trial, the debtor denied knowing that any harm would result to the creditor based upon the removal of the vehicle parts and offered witness testimony indicating that he "took good care of the van." *Id.* at 5. Further, the debtor testified that he intended to return the bench seats to the

10

creditor along with the van but realized after the repossession that they had been sold due to nonpayment by his uncle for the storage unit they were stored in. *Id.*

*Moore* cannot be reconciled with the Ninth Circuit's decision in *Ormsby,* which postdates it. In *Moore*, this Court found that the debtor did not "inten[d] the consequences to Budget of his actions, either by a subjective intent to harm Budget or a subjective belief that harm to Budget was substantially certain." 2009 WL 3837791 at *6. However, the debtor in *Moore* testified that while he "had no intention to harm Budget," he recognized that "in hindsight, he [saw] that Budget was harmed by the absence of the wheels and seats." *Id.* at 2. Stated more simply, the debtor's testimony in *Moore* amounted to a concession that the injury suffered by the creditor was a "natural consequenc[e] of his actions." *See Ormsby*, 591 F.3d at 1206. Post-*Ormsby*, such testimony establishes "willfulness" under § 523(a)(6). Insofar as *Moore* permits a debtor to avoid the natural consequences of their actions in a dischargeability proceeding under § 523(a)(6), it conflicts with *Ormsby* and, as a result, lacks any persuasive value with respect to the willfulness prong of § 523(a)(6).

In this case, Goodsell acted willfully when he removed Park Western's property (the CAT C-15 engine, transmission, and driver's seat) from the Kenworth. His removal was substantially certain to injure Park Western. Any suggestion that Goodsell believed otherwise is not credible. The 2018 Lease terms establish that, "All additions, repairs or improvements made to the Equipment shall belong to Lessor." This would include the CAT C-15 engine, transmission, and driver's seat. Neither party disputes the import of this provision. Indeed, Goodsell's own testimony indicates he understood and appreciated this contractual term and simply chose to act in a manner inconsistent with it. When asked why Goodsell removed the CAT C-15 from the Kenworth prior to returning it, Goodsell's response included the following:

11

"I mean, I understand Park Western's side of it saying, 'well, you put [the CAT C-15 engine] in our truck. We get to keep it."[18]

Further, at the time Park Western repossessed the Kenworth, Goodsell had removed the CAT C-15 engine, transmission, and driver's seat. To explain his actions, Goodsell testified that he removed the CAT C-15 engine to avoid "stealing" from Marvin. Goodsell's explanation fails to address the substantial certainty that Park Western would be injured by removal of the CAT C-15 engine from the Kenworth, Park Western had an interest in.  The 2018 Lease involved a "whole" truck with an engine capable of getting from point A to point B.  Further the 2018 Lease explicitly contemplated that if a part was replaced, Park Western would have an interest in that new part, such as the CAT C-15 in this case.  As a long-haul trucker, Goodsell was aware that the value of a semi-truck like the Kenworth is greatly diminished without an operating engine. This knowledge is further evidenced by Goodsell's plan to install the CAT C-15 in the Kenworth, sell the truck as a whole, and use the proceeds to pay both Park Western and Marvin in full.[19]

The circumstances surrounding Goodsell's transaction with Marvin leave the Court with doubts regarding Goodsell's credibility.  He testified that he only knew Marvin's first name and that he drove a red truck.[20] This causes the Court to question how Goodsell would contact Marvin or otherwise pay him when the Kenworth was sold.  Gaps such as these in Goodsell's testimony diminish his credibility.  Ordinarily, it would be unusual for the owner of an engine worth $50,000 to simply give it to another party to install in a truck based on little more than a promise of future payment.  The probability of this occurring when the only details the acquirer

---

[18] *See* Trial Transcript at 142:19–21.
[19] *Id.* at 105:5-9.
[20] *Id.* at 105:3-15.

of the engine knows about the engine's owner are that his name is Marvin and he drives a red
truck strikes the Court as low to improbable.  Further even if the Court were convinced that
"Marvin" existed and Goodsell's testimony regarding the manner in which he acquired the
engine was complete, that would not explain the removal of the transmission or driver's seat.

Rather than proceed with his plan to sell the Kenworth with Marvin's engine and pay
Park Western, Goodsell cannibalized the Kenworth leaving Park Western with an inoperable
shell that had to be hauled back to Colorado.  As a result, Park Western was forced to pay for a
replacement engine, transmission, and driver's seat before it could use, or in this case, sell the
Kenworth after repossession and mitigate its damages. Park Western's damages were natural
consequences of Goodsell's actions. Under *Ormsby*, efforts by Goodsell to explain or distance
himself from this knowledge are not persuasive because knowledge of those consequences is
imputed to him. For purposes of § 523(a)(6), Goodsell inflicted a willful injury on Park Western
by removing the CAT C-15 engine, transmission, and driver's seat from the Kenworth.

### B.  "Malicious" injury.

In addition to the willfulness prong, Park Western must establish that the debtor acted
maliciously. To prove that an injury is "malicious," a plaintiff must satisfy four elements: 1) a
wrongful act; 2) done intentionally; 3) which necessarily causes injury; and, 4) is done without
just cause or excuse. *In re Barboza*, 545 F.3d 702, 706 (9th Cir. 2008). The willful injury must
be established before malice can be inferred. *Ormsby*, 591 F.3d at 1209.

Park Western satisfied its burden to establish the willful injury requirement under §
523(a)(6). Therefore, the Court must determine whether malice can be inferred based on the
evidence presented at trial. As stated above, the evidence establishes that Goodsell either knew
or is charged with knowing (per *Ormsby*) that the removal of the CAT C-15 engine,

transmission, and driver's seat was a wrongful act. Thus, the first element under *Barboza* is satisfied. Goodsell failed to present any evidence suggesting that his removal of the specified items from the Kenworth was somehow unintentional, and his testimony establishes that he acted intentionally when he removed the items from the Kenworth, allegedly for Marvin's benefit. Thus, the second element is satisfied. There can similarly be no dispute that Goodsell's actions caused Park Western to be injured. They directly caused the Kenworth to be reduced to an inoperable shell. Thus, the third element is satisfied.

As to the fourth element, Goodsell offered an excuse for some of his actions. He explained that he felt compelled to remove the CAT-C15 engine to avoid "stealing" from Marvin. This Court must determine whether Goodsell's excuse qualifies as "just." The Ninth Circuit has defined "just" in the context of a § 523(a)(6) maliciousness analysis as "honorable and fair in dealings and actions," "consistent with moral right," and "valid within the law." *In re Bammer*, 131 F.3d 788, 792 (9th Cir. 1997). Purely subjective elements such as "compassion" do not justify or excuse behavior that is otherwise wrongful. *Id.* at 793. Goodsell's excuse does not fall within the Ninth Circuit's definition of "just."

 Essentially, Goodsell argues that his removal of the CAT C-15 engine from the Kenworth should be excused because he considered retention of the engine without paying Marvin "theft."  Goodsell testified:

> For me to have left an engine in there that was not paid for with tantamount effect. I understand what [Park Western] say[s]…but sir, *you are not going to get me to say that I find it acceptable or reasonable to steal from [Marvin] and give to these wolves*.
>
> I apologize for my tone of voice, but no. Theft is theft.[21]

---

[21] Trial Transcript at 155:16–24 (emphasis added).

In essence, as a result of his prepetition dealings with Marvin and Park Western, Goodsell faced a dilemma.  Goodsell could retain the CAT C-15 engine without paying for it and "steal" it from Marvin, or remove it from the Kenworth, thereby injuring Park Western. Goodsell's logic that it was better to injure Park Western than to steal from Marvin does not rise to the level of "just" under § 523(a)(6).  The fact that Goodsell put himself in a position that required him to steal or convert, and chose to convert instead of steal, does not amount to a "just" excuse.

The facts established at trial establish that Goodsell did more than merely commit a "technical conversion" of Park Western's property. *See Thiara*, 285 B.R. at 430. Instead, the facts show that Goodsell intentionally and wrongfully converted Park Western's CAT C-15 engine, transmission, and driver's seat. Accordingly, this Court determines that the injury inflicted upon Park Western by Goodsell was both willful and malicious.

### IV.    Damages.

This Court has determined that Goodsell's conversion of Park Western's property was willful and malicious for purposes of dischargeability under § 523(a)(6). Next, it must determine the actual amount that will be excepted from Goodsell's Chapter 7 discharge. Each party offered a calculation of damages it urges this Court to adopt. Park Western contends that the appropriate measure of damages should be calculated as follows: (1) take the fair market value of the Kenworth had it not been stripped at the time Park Western repossessed it ($60,000); (2) reduce the fair market value by the amount Park Western actually sold the Kenworth for ($60,000-$67,000= –$7,000; and (3) add that amount to the cost of repossession and repair incurred by Park Western (–$7,000+$50,815.99=$43,815.99).

Goodsell, on the other hand, urges the Court to simply take the difference between the amount Park Western purchased the vehicle for in 2015 ($35,000), add to that the cost of repairs

to the vehicle ($50,815.99), and subtract from that sum ($85,815.99) the amount Park Western

sold the Kenworth for ($67,000). Using Goodsell's calculation, he contends the

nondischargeable portion of his debt owed to Park Western should be $18,815.99. This Court

declines to adopt either approach, both of which are unsupported by any authority.

The Bankruptcy Court for the District of Idaho has considered what the appropriate

measure of damages is for a conversion claim that is excepted from discharge under  § 523(a)(6)

and developed a simple formula: "[t]he measure of damages for a conversion violating §

523(a)(6) is *the value of the property converted* or diverted." *In re Armstrong*, 2006 WL

2850527 *16 (Bankr. D. Idaho 2006). This Court adopts *Armstrong*'s formula for calculating

damages in this case.

Park Western's trial exhibit 6 was admitted at trial and contains an itemized list of the

costs associated with the Kenworth's repossession and repair. These costs total $50,815.99, the

figure relied on by both Park Western and Goodsell in their calculation of damages. However,

exhibit 6 is comprised of several charges that appear unrelated to "the value of the property

converted"–i.e. the value of Park Western's property Goodsell removed from the Kenworth. For

example, exhibit 6 contains charges for repossessing the Kenworth, transporting it to Colorado,

storage, fuel, labor associated with installing the engine, and vehicle detailing. Each of these

charges is independent from the value of the CAT-C15 engine, transmission, and driver's seat

Goodsell unlawfully converted.

Exhibit 6 makes clear that Park Western spent $24,443.25 on a new engine and

transmission for the Kenworth, not including the cost of installation.[22] Further, it indicates that

---

[22] Park Western Exhibit 6 at 5.

Park Western spent $430.00 on a replacement driver's seat.[23] While these charges may not reflect the exact value of the CAT C-15 engine, transmission, and driver's seat, they are the only evidence in the record indicating the actual "value of the property converted" by Goodsell. As a result, the Court adopts these figures to determine the amount that should be excepted from Goodsell's discharge under § 523(a)(6). This Court determines that the remaining costs incurred by Park Western and set forth in Exhibit 6, the funds it gained after the sale of the Kenworth, and the value of the Kenworth when it was purchased in 2015, have no bearing on the calculation of damages under *Armstrong*. Park Western suffered damages attributable to Goodsell's conversion in the amount of $24,873.25. This debt shall be excepted from Goodsell's discharge pursuant to § 523(a)(6).

## CONCLUSION

Based on the foregoing, this Court determines that Park Western established that Goodsell willfully and maliciously injured it by a preponderance of the evidence. The Court will enter a separate judgment against Goodsell in the amount of $24,873.25.

Dated May 3, 2021.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana

---

[23] *Id.* at 10.